1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:18-CR-00035-JLT-SKO-4 |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255, DECLINING TO HOLD EVIDENTIARY HEARING, AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |
| v. | |
| DOMINIC ADAMS, | |
| Defendant. | |
| | (Doc. 270) |

Dominic Adams is a federal prisoner, proceeding *pro se* and *in forma pauperis*. In July 2019, the Court sentenced Adams to 240 months in prison for his assault of a federal officer, in violation of 18 U.S.C. §§ 111(a)(1), (b). Pending is Adams' Motion to Vacate, Set Aside, or Correct His Sentence brought under 28 U.S.C. § 2255.[1] (Doc. 270.) For the reasons set forth below, the Court **DENIES** Adams's motion, **DECLINES** to hold an evidentiary hearing, and **DECLINES** to issue a certificate of appealability.

I.     **FACTUAL BACKGROUND**

The incident underlying Adams's conviction took place at the Atwater federal penitentiary, where Adams was an inmate. (Doc. 270 at 14; Doc. 287 at 4.)

---

[1] The Court will liberally construe Defendant's motion. *United States v. Jackson*, 21 F.4th 1205, 1216 (9th Cir. 2022) ("Pro se motions from prisoners are to be liberally construed.") (citation omitted).

A. Day Before Assault of Karam[2]

On the morning of October 5, 2017, Atwater Correctional Officer and teacher, Jeremy Karam, was stationed in the prison's programs corridor, watching inmate traffic during the penitentiary's hourly one-way move,[3] and ensuring that inmates were "going to their directed programs." (Test. of Jeremy Karam, Doc. 235 at 865:6–7, 865:25–866:4.) That morning, Karam noticed that his GED student, inmate Eric Chiago, and a group of other inmates, including Adams, exited the programs corridor and were loitering around the religious services area, unattended by prison staff. (*Id.* at 868:23–869:2l; *see also* Test. of Jagjit Johl, Doc. 228 at 314:20–24; Test. of Dianna Becerra., Doc. 229 at 629:23, 631:5–7.) Karam repeatedly asked the inmates to "either go inside of the education or recreation department," but the inmates disobeyed and "proceeded to exit out the door," with some inmates bypassing the metal detector along the way. (Karam Test., Doc. 235 at 869:2–5, 869:23–871:2; *see also* Test. of Michael Lemoine, Doc. 227 at 209:24–210:3.) Karam radioed to Correctional Officers Michael Lemoine and Dianna Becerra and told them to bring inmate Chiago back. (Karam Test., Doc. 235 at 872:13, 872:4–6; Lemoine Test., Doc. 227 at 201:19–204:12; Becerra Test., Doc. 229 at 629:12–20.)

Once the officers and Chiago rejoined Officer Karam, Karam questioned Chiago about why he walked out, however Chiago cursed at Karam in a hostile manner, disregarded him, and continued to put his hands in his pockets and his waistband. (Lemoine Test., Doc. 227 at 206:18–21.) The officers assumed Chiago may have had a weapon on his body, and conducted a strip search of Chiago to check for drugs, weapons, and other contraband. (*Id.* at 206:23–207:6.) As Chiago complied with the search, he threatened Karam. (*Id.* at 207:23–24, 209:1–8; Karam Test.,

---

[2] When citing to the trial transcript, located in docket numbers 227–230 and 235, all citations will refer to the pages and lines of the transcript itself, rather than the PDF pages of each docket entry.

[3] The penitentiary holds regularly scheduled "movement" of inmates. (*See, e.g.*, Lemoine Test., Doc. 227 at 199:16–200:2.) "Movements" occur "at the top of every hour," last around "five to ten minutes," and "are usually one-way moves," wherein inmates "leave their housing units and go either to the yard or programs corridor," or "any department that has staff in there already." (*Id.*)

"[O]nce an inmate steps out of the housing unit, they go straight to wherever they are going, and they stay there until the top of the next hour, when there is another move, and they are allowed to come back." (*Id.*; *see also* Test. of Jagjit Johl, Doc. 228 at 366:4–5 ("[O]nce the move is over, all movement is stopped."); Test. of Jeremy Karam, Doc. 235 at 866:8–10 ("And once they step out of the housing unit, there's no movement back inside. It's one way traffic. You head straight to the program and that's it.").)

Doc. 235 at 915:23–916:1.)

This incident then served as the "catalyst" for a meeting later that afternoon. (Johl Test., Doc. 228 at 396:21–23.) In the law library, a group of Native American inmates, including the group from earlier that morning, met at a table.[4] (*Id.* at 366:18–367:7, 368:12–14.) Adams was seated one table away, in the same library. (*Id.* at 463:20–464:4.) Both before and after this meeting, inmate Jonathan Mota "informed his loved ones or family that his communication was going to be cut off" the next day.[5] (*Id.* at 401:8–11, 406:2–4 (testimony of the email's contents), 479:12–22.)

A.      The Attack on Officer Karam

In the morning on October 6, 2017, Officer Karam entered the education department's copy room to make copies of papers for his classes, leaving only to surveil the hourly-scheduled move. (Karam Test., Doc. 235 at 879:5–21, 880:7–881:6.) Once Karam re-entered the copy room, inmates Mota and Chiago entered the copy room, with homemade, plastic shanks in both of their hands, and began to assault Officer Karam. (*Id.* at 882:4–7, 883:25–884:7.)

Just prior to this attack, Adams left the library and walked outside into the corridor to get a drink of water and look at the bulletin boards. (Test. of Dominic Adams, Doc. 235 at 980:13–17, 981:3–7, 981:25–982:2.) Adams heard a "bang," walked in that direction, and stopped directly in front of the copy machine door. (*Id.* at 982:11–22.) Inside the copy room, Mota and Chiago stabbed Karam's face, head, and neck. (*Id.* at 885:8, 886:9–11.) Fearing for his life, fighting back, and unable to activate his body alarm, Karam eventually fled the copy room. (*Id.* at 885:11–886:14.) As he ran out the door, he discovered more inmates, including Adams, obstructing his exit. (*Id.* at 886:21–8; Johl Test., Doc. 228 at 313:15–24 (". . . Inmate Adams attempted to obstruct Officer Karam from exiting out of the copier room."), 398:6–12, 470:17–

---

[4] Officer Johl, an employee of Atwater's intelligence department—the Special Investigative Services Department ("SIS")—testified that he believed these inmates met in the law library to get "approval from the other influential inmates within their group" to coordinate an attack on Karam and forewarn that an attack was coming. (Johl Test., Doc. 227 at 234:8–15, Doc. 228 at 395:21–396:10.)

[5] Johl also testified that when a correctional officer is attacked, "[i]nmate e-mail gets shut down, inmate phone calls, [and] visitation." (Johl Test., Doc. 228 at 392:2–4 ("No e-mails, phone calls. No movement within the institution . . ."), 393:5–7.)

471:5; Becerra Test., Doc. 229 at 666:14.)

Karam pushed and shoved his way out the door and ran down the hallway.  (Karam Test., Doc. 235 at 887:9–11.)  Adams and the other inmates chased Karam down the hallway, pulled him down and eventually tackled him to the ground.[6]  (*Id.* at 886:22–23, 887:10–17, 897:20–21; Johl Test., Doc. 228 at 315:9–13 (testifying that Adams pulled Karam down), 315:23–25 (testifying that Adams hung onto Karam's right shoulder), 316:9–10 (testifying that Adams knocked Karam down), 473:4–6; Becerra Test., Doc. 229 at 640:9 ("He is being attacked, engulfed, essentially."), 640:24–641:2 ("They continue punching him, stabbing him. . ."), 663:9–14, 664:7–18, 667:22–668:6 (testifying that Adams brought Karam down); Test. of Brian Beardsley, Doc. 229 at 683:12 ("He was being assaulted and chased."), 683:17–18 ("Karam was taken down by these inmates, including Mota and Adams."), 684:20 ("Mr. Adams was assisting Mota and Acevedo in wrestling Mr. Karam to the ground."); *see also* Govt's Ex. 10, Doc. 287, Video Surveillance at 8:14:12–8:14:20 (showing Adams chasing Karam and then tackling him to the ground).)

Eventually, officers Becerra and Beardsley respond to the assault on Karam and used "OC" spray on the inmates.  (Karam Test., Doc. 235 at 895:25–896:3, 898:1–4; Johl Test., Doc. 228 at 319:22–320:4; Becerra Test., Doc. 229 at 641:8–13); Beardsley Test., Doc. 229 at 683:21–25, 685:25–686:7.)  Even after being pepper sprayed, the inmates including Adams, continued to attack Karam.  (Video Evid., Ex. 10 at 8:14:22–8:14:34 (showing inmates continuing to kick and punch Karam after being pepper sprayed); Karam Test., Doc. 235 at 898:1–6 ("That is people getting off, jumping back on me.  I'm still trying to get up, protect myself.  At this point, the OC

---

[6] At trial, several witnesses agreed that Adams obstructed Karam from leaving the copy room, and proceeded to chase Karam down the hallway.  (*See, e.g.*, Johl Test., Doc. 228 at 313:23–314:5 ("Inmate Adams attempted to obstruct Officer Karam from exiting out of the copier room. . . ."), 398:6–12, 470:21–471:10, 473:1–6; Becerra Test., Doc. 229 at 663:7–14 ("[Adams] was one of the first that was running behind Mr. Karam."), 664:7–15, 666:14, 667:11–21), 667:22–25; Karam Test., Doc. 235 at 886:21–888:24.)  Indeed, the video surveillance footage shows the same. (Video Evid., Ex. 10 at 8:14:11–8:14:16 (Adams identified in baseball cap, chasing Karam down hallway).)

Adams, however, provided opposing testimony, stating that Karam ran at him, pushed him, dragged him down the hall, and tackled him.  (Adams Test., Doc. 235 at 982:25–983:1 (stating Karam was "running at me"), 983:6–7 ("[Karam] pushes me.  Well, I -- he's running -- he runs into me and kind of pushes me.  And so that's what happened."), 983:13–19 ("As [Karam] pushed me back, I was kind of tangled up.  He . . . grabbed me in some way . . . he was kind of pushing and dragging me at the same time."), 986:11–1, 989:12–16 (stating Karam "fell on top of [him]," and "dragged and pulled [him]"), 1012:9, 1013:15.)

has been sprayed so it's helping a little bit.  But inmates are getting off and coming right back on.
Q.  So even after the OC is sprayed?  A. Yes, sir.").)

Almost immediately after Becerra sprayed Adams with OC spray, Adams struck officer Beardsley.  (Adams Test., Doc. 235 at 1014:11–15, 1017:15–17; *see also* Video Evid., Ex. 10 at 8:14:20–22 (showing Becerra pepper spraying Adams and then Adams immediately striking Officer Beardsley).).  The inmates—now struggling to see due to the effects of the pepper spray—crawled their way to the law library, while Karam pulled himself out from underneath Beardsley's leg to get away.  (Beardsley Test., Doc. 229 at 686:4–7; Adams Test., Doc. 235 at 990:4–10; Video Evid., Ex. 10 at 8:14:31–8:14:42 (showing inmates crawling down hallway).)

## II.    **PROCEDURAL HISTORY**

On August 23, 2018, a Grand Jury charged Adams with three criminal counts: (1) conspiracy to murder a federal officer, in violation of 18 U.S.C. § 1117; (2) attempt to kill a federal officer, in violation of 18 U.S.C. § 1114; and (3) assault of a federal officer, in violation of 18 U.S.C. §§ 111(a)(1), (b).  (Superseding Indictment, Doc. 77 at 1–3.) The Court held a jury trial, beginning on April 30, 2019.  (Doc. 227.)

### A.    Trial and Sentencing

At the trial, Marshall Hodgkins, III represented Adams.  (*E.g.*, Doc. 227 at 190:3.)  In opening statements, Hodgkins framed his theory of the case: that Adams should not be "guilty by association" with the other inmates who may have conspired and attacked Karam.  (*See id.* at 191:25–192:2 ("And Mr. Adams was not involved in any conspiracy that may exist, any attempted murder that may exist, any assault that may exist, but, yes, he was with them.").)

During the trial, Adams took the stand and testified on his own behalf.  Regarding the assault of Beardsley, on direct examination, Adams testified, when questioned about the video, which recorded the events:

Q.    Okay.  Now, that was you in that group of people?

A.    Yes.

Q.    I saw you swinging.  Punching.  Is that correct?

A.    Yes.

1      Q.     Okay.  And what was going on in your mind at the time you were doing

2      that?

3      A.     Like I said, I was -- I was confused as to what was going on.  I was startled

4      at first, you know what I mean.  And like I said, it's prison.  There's -- it's -- it's

5      just a reaction.

6      . . . .

7      Q.     Okay.  Isn't it true that thereafter you threw punches?

8      A.     Yes.

9      Q.     Okay.  And who were you punching at?

10      A.     I wasn't -- honestly, I wasn't too sure who exactly.

11      Q.     Why weren't you too sure?

12      A.     Because I was just sprayed.  And I couldn't really see.

13  (Adams Test., Doc. 235 at 987:2–10, 988:1–6.) However, during cross-examination, Adams

14  testified in the following exchange:

15      Q.     It's clear there's an assault going on on Mr. Karam; right?

16      A.     Yes.

17      Q.     There's an attack going on on Mr. Karam?

18      A.     Yes.

19      Q.     And you're saying you were somehow involuntarily caught up in that and

20            dragged by Mr. Karam all the way down the hallway against your wishes?

21      A.     Yes.

22      Q.     So Mr. Beardsley is there.  And he's trying to rescue Mr. Karam; right?

23      A.     I wasn't too sure exactly what he was doing, but he said that he was.  So

24            yes.

25      Q.     And what you did was you punched Mr. Beardsley; right?  This is Exhibit

26            10-F.  Right?

27      A.     I do not recall, but apparently.

28      Q.     Apparently you punched Mr. Beardsley; right?

1    A.    Yes.

2    . . . .

3    Q.    Did you just punch Mr. Beardsley there?

4    A.    I'm not too sure exactly who I punched, but --

5    Q.    You punched a correctional officer wearing a black or dark blue vest and a

6          white shirt.  That's you punching him; right?

7    A.    Yes.

8    . . . .

9    Q.    You knew that was Officer Beardsley?

10   A.    No, I did not.

11   Q.    If you didn't know his name, you knew that was a correctional officer.

12   A.    I did not know for sure at the time.

13   (Adams Test., Doc. 235 at 1013:23–1014:15, 1017:13–17, 1017:21–25.)

14           In closing argument, regarding count III, the Government noted that "on the video you

15   see[,] and you heard testimony from Beardsley[,] that he's getting punched there by Dominic

16   Adams.  And I believe Mr. Adams acknowledged on the stand this morning that, in fact, he was

17   punching Mr. Beardsley at that time in that photo.  Claiming he didn't know who he was . . . It's

18   pretty obvious here who's the correctional officer.  And he knows he's assaulting a federal

19   officer."  (Doc. 235 at 1071:4–13.)

20           In the defense's closing argument, Mr. Hodgkins reiterated Adams's theory of the case:

21   that "there can't be guilt by association."  (Doc. 235 at 1087:2–3.)  Regarding the conspiracy

22   charge, Hodgkins continued: "Guilty by association, is it?  Mere presence . . . Mere presence at

23   the scene of where some attack may have been occurring isn't in and of itself enough of anything

24   else."  (*Id.* at 1089:12–16.)  Hodgkins argued, "Mr. Dominic Adams had no intent to kill.  Nobody

25   can prove that he had any intent to kill.  He did not have any intent to kill on that or for the

26   conspiracy to kill Mr. Karam.  And therefore, the element of each of those crimes is missing.

27   Plain and simple."  (*Id.* at 1090:25–1091:4.)  Finally, regarding the assault, Hodgkins argued to

28   the jury that Adams's ability to see and breathe were obstructed due to the pepper spray, and that

7

1    Karam pushed Adams as he was exiting the copy room.  (*Id.* at 1095:6–17.)

2           After a four-day jury trial, (Docs. 227–230, 235), the jury acquitted Adams of the first two

3    counts, and convicted him for the assault charge.  (Verdict, Doc. 181.)  Then-Chief Judge

4    Lawrence O'Neill sentenced Adams to 240 months in prison.  (Doc. 231 at 23:24–24:12.)

5           Now pending is Adams's Motion to Vacate, Set Aside, or Correct Sentence pursuant to

6    § 2255.  (Doc. 270.)  Adams requests the Court vacate his conviction and hold a new trial,

7    arguing that his counsel was ineffective.  (*Id.*)  The matter being fully briefed, (Opp'n, Doc. 287;

8    Reply, Doc. 292), the Court turns to Adams's instant motion.

9    **III.    <u>LEGAL STANDARD</u>**

10          A.  <u>28 U.S.C. § 2255</u>

11          "Section 2255 grants a prisoner in custody the right 'at any time' to bring a motion 'to

12   vacate, set aside or correct the sentence' upon the ground that the 'sentence was imposed in

13   violation of the Constitution or laws of the United States or that the sentence was in excess of the

14   maximum authorized by law."  *United States v. Roper*, 72 F.4th 1097, 1102 (9th Cir. 2023)

15   (cleaned up) (citation omitted).  A motion brought under § 2255 "collaterally attacks a federal

16   inmate's conviction or sentence, seeks 'an extraordinary remedy' and cannot substitute for an

17   appeal."  *United States v. Draper*, 84 F.4th 797, 801 (9th Cir. 2023) (quoting *United States v.

18   Pollard*, 20 F.4th 1252, 1255 (9th Cir. 2021)).  The defendant has the burden of establishing that

19   he is entitled to post-conviction relief under 28 U.S.C. § 2255.  *See United States v. Frady*, 456

20   U.S. 152, 170 (1982); *see also United States v. Shehadeh*, No. 2:16-cr-0038 MCE CKD P, 2024

21   WL 456509, at *2 (E.D. Cal. Feb. 6, 2024).

22          A § 2255 motion must, at the very least: "(1) specify all the grounds for relief available to

23   the moving party; (2) state the facts supporting each ground; (3) state the relief requested; . . .

24   [and] (5) be signed under penalty of perjury by the movant or by a person authorized to sign it for

25   the movant."  Rule 2(b), Rules Governing Section 2255 Proceedings for the United States District

26   Courts [hereinafter, "Section 2255 Rules"].  As such, it is well-settled that "conclusory

27   allegations which are not supported by a statement of specific facts do not warrant habeas relief."

28   *Clark v. Broomfield* 83 F.4th 1141, 1148 (9th Cir. 2023) (citation omitted); *United States v. Suris*,

625 F. Supp. 3d 1040, 1050 (C.D. Cal. 2022) (collecting cases).

Once the movant files the §2255 motion, the judge "must promptly examine it."  Section 2255 Rules, Rule 4(b).  "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party," otherwise, if the motion is not dismissed, the Court must order the United States attorney to file a responsive pleading.  *Id.*; *see also United States v. Baughman*, No. 22-35862, 2024 WL 1553711, at *1 (9th Cir. Apr. 10, 2024); *Baumann v. United States*, 692 F.2d 565, 571 (9th Cir. 1982); *Dota v. United States*, 368 F. Supp. 3d 1354, 1356 (C.D. Cal. 2018).

## IV.   DISCUSSION

### A.   Motion to Vacate (Doc. 270)

Adams moves to vacate his conviction wholly based on a theory that his counsel was ineffective for failing to request a self-defense jury instruction under Ninth Circuit Model Jury Instruction Number 8.5.[7]  (*See generally* Doc. 270; *id.* at 24.)[8]  In Opposition, the Government contends that Adams's counsel was not ineffective, and that "[i]t would have been inconsistent with his defense theory to assert that he intentionally used force on someone . . . that was reasonable under the circumstances."  (Opp'n, Doc. 287 at 11.)  Additionally, the Government notes that "Adams'[s] trial testimony did not establish either of the elements required to make the prima facie showing to warrant a self-defense instruction," and that Adams "did not claim that Beardsley made initial contact with him or that Beardsley threatened him in any way."  (*Id.* at 12 (citations omitted).)  The Court agrees with the Government.

---

[7] This instruction is now located at Number 8.3, per the revised 2022 Model Instructions.  MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT (2022 ed.), located at: https://www.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Criminal_Instructions_2024_03.pdf [hereinafter, "Criminal Model Jury Instructions"] *see also* Doc. 287 n.7.

The text of this instruction is identical, and has not changed, from its 2010 version.  *See* MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT (2010 ed.), § 8.5 (ASSAULT OF FEDERAL OFFICER OR EMPLOYEE—DEFENSES), located at:   https://www.ce9.uscourts.gov/jury-instructions/node/460.  The Court will therefore only cite to the updated, 2022 version for the substance of this instruction.

[8] When citing to the papers, the Court will refer to the CM/ECF pagination, or, when unavailable, the PDF page numbers.

"To obtain relief on a claim of ineffective assistance of counsel, [Adams] must establish both: (1) that his attorney's performance fell below an objective standard of reasonableness; and (2) prejudice: a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Rodriguez*, 49 F.4th 1205, 1213 (9th Cir. 2022) (internal quotation marks and citation omitted) [the "*Strickland* test"]; *United States v. Juliano*, 12 F.4th 937, 940 (9th Cir. 2021). "If either prong is not met, [the Court] must dismiss the claim." *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002); *Rios v. Rocha*, 299 F.3d 796, 806 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.") (citation omitted).

*i.*     *Deficient Performance*

"The attorney performance assessment is highly deferential: [Adams] must surmount the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Rodriguez*, 49 F.4th at 1213 (internal quotation marks and citation omitted); *Juliano*, 12 F.4th at 940 ("[B]ecause the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.") (internal quotation marks and citation omitted).  The Court evaluates the attorney's conduct "from counsel's perspective at the time, taking care not to view a lawyer's decisions in the distorting effects of hindsight[.]" *Juliano*, 12 F.4th at 940 (internal quotation marks and citation omitted).

"Section 111 of 18 U.S.C. prohibits forcible assault on a federal officer 'while engaged in or on account of the performance of official duties.'" *United States v. Acosta-Sierra*, 690 F.3d 1111, 1117 (9th Cir. 2012) (quoting 18 U.S.C. § 111(a)(1)).  It is a long-established principle that section "111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer.  All the statute requires is an intent to assault, not an intent to assault a federal officer." *United States v. Feola*, 420 U.S. 671, 684 (1975); *see also United States v. Mann*, 163 F.3d 608, 608 (9th Cir. 1998) (unpublished) ("The government did not have to prove that Mann knew that Cummings was a federal officer because there is no requirement that the defendant be aware of the official status of the person assaulted.") (citation

10

1   omitted); *United States v. Broncho*, 62 F.3d 1425, 1425 (9th Cir. 1995) (unpublished) (same).

2   Accordingly, "Section 111 is a general intent crime," *Acosta-Sierra*, 690 F.3d at 1124, meaning

3   the Government did "not need to prove anything about [Adams's] state of mind at the time he

4   acted," only "whether a reasonable man would find that [his] actions should have put a federal

5   officer in apprehension of bodily harm[.]" *United States v. Jim*, 865 F.2d 211, 212–13 (9th Cir.

6   1989) (specifically analyzing § 111); *see also Feola*, 420 U.S. at 1264–65 ("[T]o incur criminal

7   liability under [section] 111 an actor must entertain merely the criminal intent to do the acts

8   therein specified.").

9                           a.      Self-Defense Jury Instruction

10       "For purposes of Section 111, [the Ninth Circuit has] recognized that an individual may

11  make out an affirmative defense of self-defense against a federal law enforcement official who

12  uses excessive force in a narrow range of circumstances." *Acosta-Sierra*, 690 F.3d at 1126

13  (citations omitted).  To do so, Adams "must offer evidence to show: (1) a reasonable belief that

14  the use of force was necessary to defend himself or another against the immediate use of unlawful

15  force and (2) the use of no more force than was reasonably necessary in the circumstances." *Id.*

16  (internal quotation marks and citation omitted).  The same elements are required in then-Criminal

17  Model Jury Instruction Number 8.5.  *See* CRIMINAL MODEL JURY INSTRUCTION NO. 8.3 (2022) ("It

18  is a defense to the charge if . . . the defendant reasonably believed that use of force was necessary

19  to defend oneself against an immediate use of unlawful force"); *id.* ("Force which is likely to

20  cause death or great bodily harm is justified in self-defense only if a person reasonably believes

21  that such force is necessary to prevent death or great bodily harm.").

22       Though the parties offer conflicting declarations regarding Adams's stated request for a

23  self-defense jury instruction, this is of no import.  (*Compare* Adams Decl., Doc. 270 at 31, ¶ 3 ("I

24  attempted to communicate with defense counsel specifically relating to proposed jury

25  instructions, but was completely ignored on the subject.") *with* Hodgkins Decl., Doc. 290 at ¶¶ 3–

26  4 (stating that Hodgkins met with Adams "a number of times to discuss trial strategy" and

27  "specifically discussed the issue of self-defense with Mr. Dominic Adams," but that counsel

28  "gave the definite opinion that [he] did not feel tactically that making the argument for acquittal

1   in terms of self-defense was the correct way to go" because it may "leave a bad taste in the jurors'

2   mouths as the facts of the case clearly demonstrated that the attack on" Karam and Beardsley was

3   inconsistent with a self-defense claim).)

4          Notwithstanding these conflicting declarations, Adams's arguments "fail because not only

5   was there insufficient evidence to support an instruction on self-defense . . ., but [Adams] has

6   given no reason why his counsel['s] actions were ineffective." *Akhtar v. Knowles*, 373 F. App'x

7   727, 730 (9th Cir. 2010). It is clear from the trial record, video exhibit, and witness testimony,

8   that Hodgkins's decision not to request the self-defense instruction was a "'strategic choice[]

9   made after thorough investigation of law and facts relevant to plausible options and [is] virtually

10  unchallengeable.'" *Id.* (quoting *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006)). At trial, and

11  now in his instant motion, Adams admitted to striking Officer Beardsley. (Adams Test., Doc. 235

12  at 1014:11–15, 1017:15–17; Adams's Mot., Doc. 270 at 14–15 ("While on the floor and partially

13  blinded, petitioner threw several punches, at least one of which struck another guard, Officer

14  Beardsley.") The video evidence corroborates such a finding. (Video Evid., Ex. 10 at 8:14:20–

15  22.) That Adams did not know who he was punching, (Adams Test., Doc. 235 at 987:2–10,

16  1017:21–25), is not dispositive. *Feola*, 420 U.S. at 684; *Mann*, 163 F.3d at 608; *Broncho*, 62

17  F.3d at 1425. This is sufficient to convict Adams under § 111.

18         Equally important, is that Adams failed to show that he struck Beardsley in defense to

19  Beardsley's "immediate use of unlawful force," such that a self-defense jury instruction was even

20  reasonable for his counsel to request. *Acosta-Sierra*, 690 F.3d at 1126; CRIMINAL MODEL JURY

21  INSTRUCTION NO. 8.3 (2022). In other words, Adams's trial testimony would have first needed to

22  show that Officer Beardsley was using unlawful, excessive force against him, and that second,

23  Adams used reasonably necessary force to defend himself from Beardsley. *Acosta-Sierra*, 690

24  F.3d at 1126. Such a foundation is entirely absent in the trial record. *Akhtar*, 373 F. App'x at 730

25  ("'[A] defendant is entitled to a jury instruction only if the theory is legally cognizable and there

26  is evidence upon which the jury could rationally find for the defendant.'") (quoting *United States

27  v. Morton*, 999 F.2d 435, 437 (9th Cir. 1993)). Neither Adams, nor any other trial witness,

28  testified that Adams struck Beardsley in response to Beardsley's immediate use of excessive

1  force.

2        Nor does Adams's instant motion provide any basis to warrant his self-defense theory,

3  other than that "[h]e simply reacted in the moment to a very dangerous situation."  (Doc. 270 at

4  15; *see also id.* at 25 ("[V]iewed in context, it is clear petitioner was saying his punches were in

5  reaction to what he perceived was a very dangerous situation for himself."); *id.* at 27 ("[H]e was

6  reacting to protect himself.").)  What is missing from each statement is that Beardsley was the

7  initial aggressor—*i.e.*, that Adams had a reasonable belief that *Beardsley* posed a threat of using

8  an immediate use of unlawful force against Adams, and that Adams used reasonably necessary

9  force in his defense *from Beardsley*.  *Acosta-Sierra*, 690 F.3d at 1126; CRIMINAL MODEL JURY

10  INSTRUCTION NO. 8.3 (2022) ("Force which is likely to cause death or great bodily harm is

11  justified in self-defense only if a person reasonably believes that such force is necessary to

12  prevent death or great bodily harm.").  Thus, there is no basis to conclude, in either the trial

13  record, or the pending motion, that such an instruction was warranted.

14        For this reason, Adams's repeated request to apply *United States v. Span*, 75 F.3d 1383

15  (9th Cir. 1996) is also misplaced.  (*See* Mot., Doc. 270 at 28–30 (applying *Span*); Reply, Doc.

16  292 at 18–19 (same).)  In *Span*, two building-supply store owners had a physical altercation with

17  federal marshals when they stated they did not recognize a wanted fugitive.  *Span*, 75 F.3d at

18  1385–86.  Two witnesses for the defense testified that the marshals attacked first, while the

19  marshals themselves testified that the Spans attacked first.  *Id.* at 1386.  Thus, the Ninth Circuit

20  concluded that "counsel inadvertently lost the Spans[] their excessive force defense by failing to

21  request an instruction that the Spans' self-defense *in the face of an excessive use of force by the*

22  *marshals* is an affirmative defense."  *Id.* at 1389 (emphasis added); *see also id.* at 1390 ("Given

23  the facts to which the two independent defense witnesses testified, it is highly likely that a

24  properly instructed jury would have found that the Spans were not the first aggressors, but only

25  defending themselves against an excessive and outrageous use of force by the marshals.").  Both

26  Adams's trial testimony and his instant motion fail to offer *any* evidentiary basis to conclude that

27  he struck Beardsley in response to Beardsley's use of excessive force.  Instead, Adams's

28  testimony was that he struck because he was simply confused during the melee.  (Adams Test.,

13

1   Doc. 235 at 987:8–10 ("I was confused as to what was going on . . . it's prison . . . it's just

2   reaction.").)  This is an insufficient basis to warrant a self-defense instruction, and *Span* is

3   therefore inapplicable to his instant motion.

4        Therefore, the Court concludes that Hodgkins's decision not to request a self-defense jury

5   instruction was sound trial strategy.  *Rodriguez*, 49 F.4th at 1213; *Juliano*, 12 F.4th at 940; *see*

6   *also Akhtar*, 373 F. App'x at 730 ("Counsel may well have considered that such self-defense

7   instructions would serve only to anger the jury, given the lack of evidence of self-defense.").

8   Ultimately, "[a] disagreement with counsel's strategic decisions does not equate to ineffective

9   assistance of counsel."  *Akhtar*, 373 F. App'x at 730 (citing *Bashor v. Risley*, 730 F.2d 1228,

10  1241 (9th Cir. 1984)).  There being no evidentiary basis or foundation in the record to argue that

11  Adams struck Beardsley in self-defense, the Court cannot reasonably determine that Hodgkins

12  acted below an objective standard of reasonableness.  *Rodriguez*, 49 F.4th at 1213.  As Adams

13  has failed to meet the first *Strickland* prong, the Court need not evaluate the merits of the second

14  prong.  *Sanchez-Cervantes*, 282 F.3d at 672; *Rios*, 299 F.3d at 806.  The Court therefore **DENIES**

15  Adams's Motion to Vacate (Doc. 270).

16              B.       Evidentiary Hearing

17       Adams does not appear to request an evidentiary hearing.  (*See generally* Doc. 270.)

18  However, "[w]hen a defendant files a motion under 28 U.S.C. § 2255, the district court 'shall'

19  grant an evidentiary hearing 'unless the motion and the files and records of the case conclusively

20  show that the prisoner is entitled to no relief.'"  *United States v. Rodriguez*, 49 F.4th 1205, 1213

21  (9th Cir. 2022) (quoting 28 U.S.C. § 2255 and *United States v. Howard*, 381 F.3d 873, 877 (9th

22  Cir. 2004)).  "A hearing must be granted unless the movant's allegations, when viewed against

23  the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to

24  warrant summary dismissal."  *Id.* (internal quotation marks and citation omitted).  "In other

25  words, a hearing is mandatory whenever the record does not affirmatively manifest the factual or

26  legal invalidity of the petitioner's claims."  *Id.* (internal quotation marks and citation omitted).  In

27  cases where the defendant moves to vacate his sentence premised on a theory of ineffective

28  assistance of counsel, the Court need not provide an evidentiary hearing if the "record provides an

adequate basis on which to resolve" the inquiry.  *United States v. Rodriguez-Vega*, 797 F.3d 781, 792 (9th Cir. 2015); *Rodriguez*, 49 F.4th at 1216 ("The district court should have held an evidentiary hearing unless the record 'conclusively' disproved Rodriguez's claim.").  If the "material facts" for this inquiry— *i.e.*, what the lawyers "*did*, what they *didn't* do, and *why*"—are not in dispute, no evidentiary hearing is necessary.  *Mitchell v. United States*, 790 F.3d 881, 886 (9th Cir. 2015) (emphases in original).

Though there may be a dispute regarding whether Mr. Hodgkins "ignored" Adams's request for a self-defense jury instruction, (Adams Decl., Doc. 270 at 31, ¶ 3), the Court need not hold an evidentiary hearing because the record conclusively disproves Adams's claim and shows that he is not entitled to relief.  *Rodriguez*, 49 F.4th at 1213, 1216.  Adams has not adequately shown—in his motion, or elsewhere in the trial record—that his attorney was ineffective for failing to request a self-defense jury instruction, particularly when neither he, nor any other witness, testified that Adams struck Beardsley in response to an immediate threat of excessive force.  Nor has Adams alleged facts outside the record to show the same.  (Doc. 270.)  Accordingly, the Court shall not hold an evidentiary hearing on this motion.

### C.    Certificate of Appealability

Finally, Adams has not requested a certificate of appealability, but the Court addresses whether one should issue.  *United States v. Suris*, 625 F. Supp. 3d 1040, 1052 (C.D. Cal. 2022).  The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

In deciding whether to grant a certificate of appealability, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 580 U.S. 100, 115 (2017) (internal quotation marks and citation omitted); *Rodriguez*, 49 F.4th at 1211 n.2.  In other words, to obtain a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Ochoa v.*

1    *Davis*, 50 F.4th 865, 891–92 (9th Cir. 2022) (internal quotation marks and citation omitted).

2          For the reasons discussed above, Adams has not made a substantial showing of the denial

3    of a constitutional right.  Reasonable jurists could not plausibly debate the outcome of Adams's

4    petition, as the trial record makes clear he is not entitled to relief, and Adams has not cited to facts

5    or material outside the record to show otherwise.  The Court therefore **DECLINES** to issue a

6    certificate of appealability.

7                              **CONCLUSION AND ORDER**

8          For the reasons set forth above:

9          (1) Defendant's Motion to Vacate (Doc. 270) is **DENIED**.

10         (2) The Court **DECLINES** to hold an evidentiary hearing in connection with Defendant's

11             motion.

12         (3) The Court **DECLINES** to issue a certificate of appealability.

13

14   IT IS SO ORDERED.

15       Dated:   **May 18, 2024**

                                                    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28